

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

NOV 1 4 2006

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 3:05-CR-240-P |
| | § | |
| RAKESH JYOTI SARAN (1) | § | |

## FACTUAL RESUME

Defendant, Rakesh Jyoti Saran, reviewed with his attorneys, Jeff A. Kearney and Benson B. Weintraub, the defendant acknowledges that he understands that in order to establish his guilt for Count 1 of the indictment charging conspiracy to commit healthcare fraud, wire fraud, mail fraud, money laundering, and illegal monetary transactions, a violation of 18 U.S.C. § 371, Counts 12 and 13 of the indictment charging mail fraud, a violation of 18 U.S.C. § 1341 and 2, and  Count 92 of the indictment charging conspiracy to distribute controlled substances, a violation of 21 U.S.C. § 846, 841(a)(1) and 841(b)(1)(D), the United States must prove each of the following elements of the offense beyond a reasonable doubt.

Count 1
18 U.S.C. § 371
Elements of Conspiracy

First:    That the defendant, and at least one other person, made an agreement to commit the crime of healthcare fraud, wire fraud, mail fraud, money laundering, or illegal monetary transactions as charged in the indictment;

Second:        That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

Third:         That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy.

Counts 12 and 13
18 U.S.C. §§1341 and 2
Elements of the Mail Fraud

First:         That the defendant knowingly created a scheme to defraud, that is to make false representations to Group Purchasing Organizations (GPOs) to obtain "contract pricing" for the purchase of pharmaceuticals from commercial wholesalers and manufacturers; falsely represent to own and operate "own use" and "closed door" pharmacies; fraudulently obtain pharmaceuticals in violation of "own use" or "closed door" pharmacy contract restrictions; use numerous closely held entities to disguise the identity of the purchaser of pharmaceuticals from wholesalers and manufacturers; conceal the fraudulent restricted purchases and sales by altering records and documents; sell the fraudulently obtained product to other commercial wholesalers, fraudulently and illegally distribute controlled substances through the Internet; fraudulently obtain and distribute in excess of $200 million worth of pharmaceuticals; and divert the fraudulently obtained proceeds from the sale and distribution of pharmaceuticals for personal use and benefit.

Second:        That the defendant acted with a specific intent to commit fraud;

Third:         That the defendant mailed something or caused another person to mail something for the purposes of carrying out the scheme.

Fourth:        That the scheme to defraud employed false material representations

A "scheme to defraud" includes any scheme to deprive another of money, property, or of the intangible right to honest services by means of false or fraudulent pretenses, representations, or promises.

## Count 92
## 21 U.S.C.§ 846
### Elements of Conspiracy to Illegally
### Distribute Controlled Substance

First:          That two or more persons, directly or indirectly, reached an agreement to distribute and possess with the intent to distribute, outside the scope of professional practice and not for a legitimate medical purpose, a controlled substance, to wit: hydrocodone, a Schedule III controlled substance, phentermine, Schedule IV controlled substance, alprazolam, a Schedule IV controlled substance, or promethazine cough syrup with codeine, a Schedule V controlled substance;

Second:       That the defendant knew of the unlawful purpose of the agreement;

Third:         That the defendant joined in the agreement willfully, that is, with the intent to further its unlawful purpose.

### Stipulated Facts

On or about June 28, 1999, and continuing through September 21, 2005, Rakesh Jyoti Saran (Saran), admits he knowingly and willfully conspired with Sherman Ted Solomon (Solomon), Leslie Wayne Davidoff (Davidoff), Stacy Fred Word (Word), David Kaiser (Kaiser) and other co-conspirators, to commit healthcare fraud, wire fraud, mail fraud, money laundering, illegal monetary transactions, and engaging in the illegal distribution of controlled substances. Saran admits the conspiracy involved the fraudulent purchase of pharmaceutical products from wholesalers at fraudulently obtained discount prices for resale to gray market wholesalers at a substantial profit. Saran admits he knowingly acted in concert with other co-conspirators, to accomplish the objectives of the conspiracy. Saran admits the scheme defrauded a healthcare benefit program; namely the

private purchase contract executed between a GPO and pharmaceutical manufacturers. Saran admits the mail was used to facilitate and execute the scheme to defraud; namely material false representations were mailed to GPOs, wholesalers, and manufacturers. Saran admits that interstate wire communications were used to facilitate and execute the scheme to defraud; namely interstate telephone conversations, facsimiles of false representations to GPOs, wholesalers, manufacturers, and wire transfer of money as payment for the pharmaceutical products.

Saran admits he knowingly and intentionally conspired with other co-conspirators, by agreeing to, and engaging in, the illegal distribution of controlled substances, including but not limited to, promethazine cough syrup with codeine, phentermine, hydrocodone, and alprazolam. Saran admits the quantity of hydrocodone, a Schedule III controlled substance, he illegally distributed, or caused to be illegally distributed, exceeded 40,000.00 dosage units. Saran admits the quantity of phentermine, a Schedule IV controlled substance, he illegally distributed, or caused to be illegally distributed, exceeded 40,000.00 dosage units. Saran admits the quantity of alprazolam, a Schedule IV controlled substance, he illegally distributed, or caused to be illegally distributed, exceeded 40,000.00 dosage units. Saran admits the quantity of promethazine cough syrup with codeine, a Schedule V controlled substance, he illegally distributed, or caused to be illegally distributed, exceeded 40,000.00 dosage units.

The conspirators purchased pharmaceutical products from wholesalers at significantly discounted prices. The conspirators acquired the discount contract pricing

from wholesalers by fraudulently becoming a member of GPOs. A GPO was an entity

authorized to act as a purchasing agent for a member group of entities that contracted

with pharmaceutical manufacturers for the benefit of the member group. The

manufacturers rebated the wholesalers the contract price discounts. Contract pricing was

discounted pricing obtained by a GPO for the benefit of its' member group. The

discounts were applied pursuant to contracts executed between the GPO and the

pharmaceutical manufacturers. Contract pricing of pharmaceuticals were subject to

contractual "own use" or "closed door pharmacy" restrictions. An own use or closed

door pharmacy was an entity whose distribution was restricted by contract to filling

prescriptions for institutions such as hospitals, nursing homes, and prisons.

Pharmaceutical manufacturers agreed to discount prices for institutional distribution

because prisons, nursing homes, state, county, and municipal hospitals were government

funded.

Saran companies included: Carrington Health Systems, Inc. (Carrington), Infiniti

Services Group, Inc. (Infiniti), National Executive Management, Inc. (National), Alliance

Pharmacy Services, Inc. (Alliance), AMS Pharmaceuticals Group, Inc. (AMS), Collective

Services, Inc. (Collective), Dalamar Services, Inc. (Dalamar), East Pointe Pharmacy

Services, Inc. (East Pointe), Everest Services, Inc. (Everest), Med-Care Infusion Services,

Inc. (Med-Care), Orion Pharmacy Services, Inc. (Orion), Precision Pharmacy Services,

Inc. (Precision), Premium Pharmacy Services, Inc. (Premium), Quantum Infusion, Inc.

(Quantum), Reliance Pharmaceutical, Inc. (Reliance), Southwest Infusion, Inc.

(Southwest), SWS Pharmacy Services, Inc. (SWS), Texas Home Infusion, L.L.C. (Texas Home), Tri-Phasic Pharmacy, Inc. (Tri-Phasic), Trinity Infusion Services, Inc. (Trinity Infusion), and Trinity Pharmacy Services, Inc. (Trinity Pharmacy). Saran admits the corporations identified above were used to further the scheme to defraud GPOs, commercial wholesalers, manufacturers and the Government to regulate the distribution of controlled substances.  Saran admits the corporations were his alter ego and he obtained nominees to hold the companies in their names. Saran admits he controlled and made the decision for the companies.

Saran fraudulently obtained membership with GPOs by representing his businesses were closed door pharmacies with exclusive distribution to long term care and institutional facilities to obtain contract pricing from the commercial wholesalers.  Saran purchased pharmaceutical product at contract pricing from commercial wholesalers pursuant to GPO contracts.  Saran violated the own use GPO contracts.  Saran admits the contract priced inventory was not being used for own use or closed door pharmacy distribution.  Saran knew the fraudulently acquired product was being resold to gray market commercial wholesalers.  Saran set the price for the sales to the gray market wholesalers.  The scheme recognized significant profits from the fraudulently obtained pharmaceutical product sold to the gray commercial wholesalers.

Saran admits he committed or caused to be committed the following overt acts in furtherance of conspiracy to defraud health care pharmaceutical GPO, commercial wholesalers, and manufacturers:

On or about November 22, 1999, Saran falsely represented to Pharmaceutical Buyers Inc., (PBI), a GPO, that he was the president of Get Well Pharmacy & Medical Services, located in Fort Lauderdale, Florida.

On or about November 7, 2001, Saran falsely represented in correspondence to mailed to GPO Managed Health Care Associates, Inc., that Texas Home was a closed door pharmacy with institutional distribution to home health care facilities.

On or about November 12, 2001, Saran falsely represented and certified to Managed Health Care Associates, Inc., a GPO, that AMS was an "own use" pharmacy and agreed to all the conditions associated with the purchase pharmaceuticals through the Managed Health Care Associates contract.

On or about March 30, 2004, Saran used the United States Postal Service to deliver material false representations about the business practices of Southwest Infusion, Inc., Arlington, Texas, to Clayton K. Whitehead, a pharmacist employed by GlaxoSmithKline, Research Triangle Park, North Carolina.

On or about May 6, 2005, Saran falsely represented to a DEA investigator that he was Imraan Siddiqui, secretary of East Pointe.

Saran and other defendants, conspired to purchase promethazine cough syrup, with codeine, a Schedule V controlled substance, hydrocodone tablets, a Schedule III controlled substance and alprazolam tablets, a Scheduled IV controlled substance from a commercial wholesale pharmaceutical company located in the Northern District of Texas, and from other commercial wholesale pharmaceutical businesses for distribution in

furtherance of the conspiracy.

The conspirators transported the promethazine to Saran's unregistered warehouse locations and were instructed by Saran to soak the pint bottles of promethazine in water to soften the manufacturer's labels for removal from the bottles. Matthew Fred Valdez, Wayne Levoie Branam, David Thane Muns, and other co-conspirators scraped the labels from the bottles that contained the lot numbers, expiration dates, and manufacturer's identification information to conceal the bottles manufacturers identity and origin. The removal of the information made it more difficult to trace the origin of the Scheduled V controlled substance back to Saran and his purchase of the product from the commercial wholesalers and manufacturers.

Saran , Solomon, and Davidoff, and other co-conspirators, agreed to distribute and possess with the intent to distribute, controlled substances to Internet drug seeking customers without legitimate prescriptions. Saran knew that controlled substances would be distributed to Internet customers without the existence of a doctor patient relationship. Saran knew the Internet controlled substance distributions were outside the scope of professional practice and not for a legitimate medical purpose.

On or about May 13, 2005, Solomon, through www.e-discountrx.com, accepted an Internet order for 30 tablets of Norco 10/325mg hydrocodone from an undercover investigator posing as Internet customer "Shane Gravel."

On or about May 18, 2005, Saran, assisted Davidoff, via Tri-Phasic, to fulfill Solomon's website drug order and distributed 30 tablets of Norco 10/325mg hydrocodone

to Internet customer "Shane Gravel," without verifying a legitimate medical purpose, a prescription, or the identity of the Internet customer.

On or about May 25, 2005, Saran's Infiniti emailed Solomon and attached an excel file which listed: (i) the controlled substance orders filled on May 17, 2005, including "Shane Gravel's"order; (ii) Infiniti's cost to fill "Gravel's" order as $16.30; and (iii) Infiniti's cost to fill all of Solomon's orders for that day as $7,784.00.

Saran set up (May 2005) and operated www.nationsdrugsupply.com as an Internet Facilitation Center (IFC) from his central office located at 1700 Tech Centre, Arlington, Texas. Saran set up and operated www.nationsdrugsupply.com for the purpose of facilitating his drug distribution operation. Saran admits he committed or caused to be comited the following overt acts in furtherance of the conspiracy to distribute controlled substances by the through the internet outside the scope of professional conduct and practice:

On or about May 25, 2005, Saran, Davidoff, Southwest Infusion Inc., and others, distributed 90 tablets of 10/325mg hydrocodone to an undercover investigator posing as "Zach Taylor" without verifying a legitimate medical purpose, a prescription, or the identity of the Internet drug seeking customer.

Saran admits he committed or caused to be committed the following overt acts in furtherance of the back door street distribution of controlled substances:

On or about April of 2004, and continuing through September 21, 2005, Jared Anderson delivered approximately $20 million in currency to Saran. The cash was

obtained through the street drug sales of promethazine cough syrup with codeine, hydrocodone and alprazolam.

In October of 2004, Saran instructed Branam to deliver 2,400 label scraped pint bottles of promethazine, and 100 label scrapped bottles, 500 tablets per bottle, of hydrocodone to a drug dealer in Houston, Texas. The conspirators delivered 228,000 dosages of promethazine, a Schedule V controlled substance, and 50,000 dosages of hydrocodone tablets, a Schedule III controlled substance. A U-Haul truck was rented to deliver the load to Houston. Muns and Valdez, employees of Saran, assisted Branam in the loading of the U-Haul. Branam delivered the promethazine and hydrocodone to Houston. Branam collected payment for the delivery of the controlled substances in cash for Saran. Branam was paid $10,000.00 for the delivery of the drugs. Saran instructed Branam to make a second trip to Houston. Saran, Branam, Valdez, and Muns caused another 228,000 dosages of promethazine, a Schedule V controlled substance, and 50,000 dosages of hydrocodone tablets, a Schedule III controlled substance, to be delivered in Houston in exchange for cash money.

On or about February 8, 2005, Saran, and others, possessed 1,869 pint bottles of promethazine cough syrup with codeine at the Duluth warehouse.

Beginning June 28, 1999, and continuing through September 21, 2005, Saran conspired to illegally obtain contract pricing and terms, and to illegally and fraudulently obtain and illegally sell, in violation of GPO contracts, $211,000,000.00 of pharmaceutical product.

Saran purchased the following property using proceeds obtained by him as a result of and traceable to the commission of the offenses alleged in the conspiracies (the offenses described above and alleged in Counts 1 and 92 of the Indictment) and/or the following property constitutes proceeds obtained by him as a result of and traceable to the commission of the offenses alleged in the conspiracies (the offenses described above and alleged in Counts 1 and 92 of the Indictment) :

a.  One 2005 Honda Odyssey, VIN 5FNRL38815B059805.

b.  Assorted jewelry contained in Bank of America safe deposit box #910 seized on or about September 21, 2005, specifically two gold pearl-and-diamond earrings; two pearl necklaces; one platinum choker necklace; and two platinum earrings.

c.  Assorted jewelry at 5918 Gary Lane, Arlington, Texas seized on or about September 21, 2005.

d.  The real property and all buildings, appurtenances, and improvements located at 2320 Panorama, Arlington, Texas, more particularly described as Lot 6 and 7, Block 2, of Phase I And Phase II, The Estates On Rush Creek, An Addition To The City Of Arlington, Tarrant County, Texas, According To The Plat Thereof Recorded In Volume A, Page 2168, of The Plat Records Of Tarrant County, Texas. Now Known As Lot 6R, Block 2, The Estates On Rush Creek, An Addition To The City Of Arlington, Tarrant County, Texas, According To The Plat Thereof Recorded In Volume A, Page 6877, Of The Plat Records Of Tarrant County, Texas.

e.  $29,238.40 in funds from Account # XXX-XXX1445 in the name of Carrington Healthcare at Wells Fargo Bank, N.A. seized on or about September 21, 2005.

f.  $1,790.00 in U.S. Currency seized on or about September 21, 2005.

g.  $1,506.47 in funds from Account # XXX-XXX1460 in the name of East Pointe Pharmacy Services, Inc. at Wells Fargo Bank, N.A. seized on or about September 21, 2005.

h.  $349,516.94 in funds from Account # XXX-XXX1486 in the name of Infinity Services Group, Inc. at Wells Fargo Bank, N.A. seized on or about September 21, 2005.

i.  $1,027,706.00 in U.S. Currency at 5918 Gary Lane, Arlington, Texas seized on or about September 21, 2005.

j.  $10,109.73 in funds from Account #XXXXX-XXX-5295 in the name of Johar and Reshma Saran at Bank of America, N.A. seized on or about December 12, 2005.

k.  Miscellaneous money orders totaling $3,342.00 at 1126 S. Cedar Ridge, Duncanville, Texas seized on or about September 20, 2005.

l.  Eleven Kirby Lester Tablet Hoppers (model KL502), serial numbers V03210; V03213; V03212; V03214; V03208; V03211; V03194; V03203; V03193; V03207; and V03206.

m.  Eleven Kirby Lester Tablet Counters (model KL200), serial numbers K21085A; K21099A; K21104A; K21100A; K21095A; KL21085A; K21103A; K21098A; K20196A; K21093A; and KL21084A.

n.  Three MTS Package Sealers (Masterpiece 110S - model LR5921), including serial numbers MZ00311 and S00535.

o.  One Kirby Lester Tablet Counter, model KL15df, serial number SDF1573.

p.  One 2005 Honda Accord, VIN 1HGCM55165A010938.

q.  One 2002 Honda Odyssey, VIN 2HKRL18782H552616.

r.  One 2003 BMW 760Li, VIN WBAGN83413DK10193.

s.  One 2003 Lexus LX7, VIN JTJHT00W933533396.


AGREED TO AND SIGNED this 14 day of Nove 2006.


_____
RAKESH JYOTI SARAN
Defendant


_____
Jeff A. Kearney
Attorney for Defendant
Texas State Bar No. 11139500

_____
BENSON B. WEINTRAUB
Attorney for Defendant
Florida Sate Bar No. 486418


RICHARD B. ROPER
UNITED STATES ATTORNEY

_____
WILLIAM C. MCMURREY
Assistant United States Attorney
Texas State Bar No. 13811100
1100 Commerce Street, Third Floor
Dallas, Texas  75242-1699
Telephone: 214.659.8649
Facsimile: 214.767.4100
william.McMurrey@usdoj.gov